*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* H. KREGLING, Minor.

UNPUBLISHED
May 18, 2023

No. 362707
Calhoun Circuit Court
Family Division
LC No. 2020-002329-NA

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to the minor child, HK, under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (j). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

This case arises following the death of HK's infant brother. Respondent had left HK and her brother with their father, who became frustrated that the children were crying. At one point, he picked HK's brother up and slammed him onto the ground. HK's brother became unresponsive. At the hospital, doctors found that there was skin scrapped off of the child's heel, that he had apparent bite marks on his buttocks and left leg, and that there appeared to be thermal or chemical burns on the soles of the feet. He also had sustained severe head trauma and appeared to be "brain dead." He died two days later. Following the death of her brother, HK's father was charged with open murder and child abuse, and the Department of Health and Human Services (DHHS) filed a petition seeking to terminate his parental rights to HK. At that time, respondent was not named as a respondent-parent.[1]

Following the death of HK's brother, respondent arranged for HK to visit her maternal grandparents. Respondent did not intend to pick HK up from the visit. Instead, she reported to Child Protective Services that she did not have "room" for HK in her house, that she could not provide care for HK, and that she preferred that her parents to take over providing care for HK.

---

[1] The parental rights of HK's father were eventually terminated. He has not appealed that decision.

Later, the DHHS amended its petition to add respondent as a respondent-parent, added allegations pertaining to her inability to provide proper care and custody for HK, asked the court to remove HK from respondent's care, and requested the court to take jurisdiction over HK as to respondent. On the same day that the petition was amended, respondent reached a plea agreement with the lawyer for the DHHS. The agreement, which was placed on the record, required her to consent to the authorization of the petition and enter a plea of admission to some of the allegations. Thereafter, she would be provided services to reunify her with HK. At the time she was not represented by a lawyer.

On the record, however, the court advised her of her right to a lawyer, and she agreed to waive that right. She also waived a reading of the petition, waived a probable cause hearing, and consented to the authorization of the petition. The trial court then advised her, at length, of the rights that she would be giving up if she entered a plea of admission to the allegations in the petition, the consequences of her plea, and her rights related to appealing the removal and adjudication decisions resulting from her plea. Respondent, thereafter, waived her rights, and entered a plea of admission to several allegations in the amended petition.

After accepting her plea, the court indicated that the following services should be provided to respondent: a psychological evaluation, grief counseling, mental-health counseling, housing assistance, transportation assistance, and parenting classes. Subsequently, at a May 2021 review hearing, respondent—who was now represented by a lawyer—requested that the trial court ensure that she receive services compliant with the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. The trial court indicated that ADA-compliant services would be provided if the psychological evaluation indicated that respondent needed accommodation.

Respondent had already completed the psychological evaluation in April 2021. She scored 70 points for the verbal comprehension intelligence quotient and 71 points for the working memory intelligence quotient. Her scores were in the borderline range, and the psychologist who prepared the report explained that respondent was "prone to have marked difficulties understanding and processing more complex communication." Additionally, the psychologist stated that respondent was "prone to be more inattentive and distractible." He recommended that respondent receive supervised and structured visitation with HK, grief counseling, and parent training. The psychologist also recommended that her therapist provide information in concrete and broken-down terms, with encouragement for respondent to "teach back" information that she received.

Although the trial court did not accept the evaluation into evidence until November 2021, respondent's caseworker provided services in line with the recommendation after she received it. The caseworker testified that she had offered respondent supportive visitation for parenting education, transportation assistance, housing referrals, and mental-health referrals. Because of respondent's cognitive limitations, the caseworker reviewed resources and referrals with respondent and then had respondent repeat back her understanding of the information. The caseworker also allowed additional time for respondent to ask questions, provided respondent with a monthly calendar of visits and appointments, and set respondent up with a group chat with HK's caregivers. The caseworker explained that respondent was attending monthly group therapy, ongoing individual therapy, and supportive visitation with HK. During the visits, respondent spent the majority of her time on electronic devices and did not engage with HK. She also displayed frustration during the visits.

Throughout the proceedings, respondent continued to engage with HK's father, notwithstanding that he was incarcerated for killing respondent's son and had, in fact, admitted to doing so. Indeed, during one review hearing, the caseworker explained that respondent had near daily communications with HK's father, but declined parenting-time visits, cancelled scheduled parenting-time visits, did not attend HK's medical appointments for genetic testing or podiatry, and only sporadically attended HK's speech-therapy appointments. Further, despite professing that she did not have gas money, respondent would place money in HK's father's commissary account. The caseworker explained that she had been working with respondent on an adult-case-management referral to assist with employment, budgeting, and financial assistance, but, given that respondent expressed an intent to remain with the man who had murdered her child "no matter what," the caseworker did not believe that respondent would benefit from further time to partake in such services. The caseworker also noted that housing was another barrier to reunification because respondent had been evicted from her home during the pendency of the case and was sleeping on friends' couches. In light of respondent's ongoing barriers to reunification the caseworker eventually requested that the goal for respondent be changed from reunification to termination.

A termination hearing was held in July 2022. Following the hearing, the trial court found by clear and convincing evidence that there were statutory grounds to terminate respondent's parental rights to HK under MCL 712A.19b(3)(c)(*i*) (c)(*ii*), and (j). The court found that respondent had been offered significant additional services and accommodations because of her disability, but that she had failed to benefit from those services and accommodations. She continued to be unable to provide HK with proper care and custody. Her behavior at parenting time was not appropriate, she remained homeless, and her mental-health issues had not been rectified. Indeed, respondent refused to take medication for her mental health. Moreover, respondent continued to communicate with HK's father even after his parental rights were terminated because of his murder of HK's brother. In doing so, the court found that she chose HK's father over HK. The court added that, although HK had significant medical needs, respondent did not attend her medical appointments. On one occasion, respondent opted to skip HK's medical appointment because it conflicted with a tattoo appointment she had made for herself.

As to best interests, the court found that respondent's bond with HK was strained. During parenting-time visits, respondent would play on her phone, was unable to control her temper, and did not properly supervise HK. Following the visits, HK's development would regress. The court noted that HK was extremely bonded with her maternal grandparents, and that her special-medical needs were being met. The court found that HK's need for permanence and stability was being met by her grandparents, but could not be met by respondent. As a result, it found by a preponderance of the evidence that termination of respondent's parental rights was in HK's best interests, and it entered an order terminating respondent's parental rights to HK.

## II. CHALLENGES TO REMOVAL AND ADJUDICATION

Respondent raises two challenges to the combined preliminary hearing and adjudication hearing. First, she suggests that the DHHS violated her constitutional right to parent HK because, despite its awareness of her cognitive impairments, it filed a petition seeking removal of HK from her care and requesting the court to take jurisdiction over HK based on her inability to provide

proper care and custody. Second, she argues that, because of her cognitive impairment, her waiver of the right to counsel at that hearing was not made knowingly.

We conclude that her challenges are barred because respondent did not timely appeal the court's order of removal and initial order of disposition following adjudication. Both orders were appealable as of right, see MCR 3.993(A)(1) and (2), and respondent was advised of her right to appeal. Respondent was also advised that she could be barred from challenging the court's assumption of jurisdiction in an appeal from the order terminating her parental rights if she did not timely file an appeal of that decision. Alternatively, respondent could have filed a delayed appeal under MCR 3.993(C). Respondent did not appeal either decision as of right under MCR 3.993(A), nor did she file a delayed appeal under MCR 3.993(C).

Instead, at the initial dispositional review hearing in May 2021, she requested—through her lawyer—that she be provided with accommodations to the services under the ADA. Between May 2021 and February 2022, respondent participated in various services. Because of her lack of benefit from the services proffered, the DHHS changed the goal from reunification to termination. She received additional services between February 2022 and July 2022, when her parental rights were eventually terminated. Respondent's appeal in this case, therefore, is an appeal of the order terminating her parental rights. That order was entered more than a year after the adjudication hearing. Under MCR 3.971(C), a "respondent may challenge the assumption of jurisdiction in an appeal from the order terminating respondent's parental rights if the court fails to properly advise the respondent of their right to appeal pursuant to subrule (B)(6)—(8)." Here, however, respondent does not allege that the court failed to properly advise her of her appellate rights. Consequently, we conclude that, because her challenge is untimely, she may not contest the trial court's assumption of jurisdiction in this appeal of the order terminating her parental rights, nor may she challenge the trial court's order of removal.

### III.  REASONABLE EFFORTS

### A.  STANDARD OF REVIEW

Respondent next contends that the DHHS did not make reasonable efforts at reunification because it failed to sufficiently accommodate her cognitive impairment. The trial court's finding that petitioner made reasonable efforts to reunify a respondent with his or her child is reviewed for clear error. *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos 358502 & 358503); slip op at 3. "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

### B.  ANALYSIS

Respondent directs this Court to our Supreme Court's opinion in *In re Hicks/Brown*, 500 Mich 79; 893 NW2d 637 (2017). In that opinion, our Supreme Court explained that, generally, the DHHS has a duty to make reasonable efforts to reunify a child with his or her parent. *Id*. at 85, citing MCL 712A.19a(2) and MCL 712A.18f(3)(b) and (c). Further, in cases where a parent is entitled to accommodations under the ADA, the DHHS must make "reasonable modifications to the services or programs offered to a disabled parent" so as to accommodate the parent's

disability. *In re Hicks/Brown*, 500 Mich at 86. The failure to make such accommodations will preclude a finding that the DHHS has fulfilled its duty to make reasonable efforts at reunification under MCL 712A.19a(2). *Id*. Although the DHHS "cannot accommodate a disability of which it is unaware," *id*. at 87, in this case, respondent's lawyer asked for accommodation under the ADA and psychological testing showed that respondent had cognitive impairments.

Respondent argues that she was not provided with sufficient accommodation for her cognitive impairments. Yet, the record reflects that respondent was provided with numerous services aimed at reunifying her with HK. At the termination hearing, the caseworker testified that she provided respondent with transportation assistance by providing gas cards on a near weekly basis. At one point, the DHHS attempted to provide respondent with a free vehicle, but respondent declined because she wanted to keep using the vehicle that was leased in her name and HK's father's name. The caseworker also assisted respondent with looking for housing. She provided respondent with housing packets and highlighted specific information relevant to respondent's situation. Respondent's caseworker also informed respondent's adult case manager of respondent's need for housing. At one point, housing was located, but respondent refused it because she did not want to live with a roommate. Respondent also received referrals for mental-health treatment. When respondent was unwilling to call Community Mental Health by herself, her caseworker "sat down with her and completed the intake with her." Respondent did, in fact, treat with a therapist regularly for over a year. Respondent received parenting classes and completed a supportive visitation program. She received frequent parenting time, including over remote videoconferencing technology. Finally, respondent was provided with grief support, IQ testing, and a psychological evaluation.

Because of respondent's cognitive delay, she received additional assistance. Her caseworker testified that she provided respondent with monthly calendars that included visit information and case-related appointments. The calendar included the phone number and address of each provider for all of respondent's and HK's appointments. Moreover, the caseworker explained that she reviewed every service plan with respondent by reading each section to her and then having "her repeat back her understanding before signing." She used the same process for "all significant documentation." The caseworker would also provide respondent with lists to assist her in keeping track of everything. Further, for "quite some time" the caseworker had "near daily conversations" with respondent to ensure "that she knew what services she needed." The caseworker also made herself available to respondent outside of normal working hours.

On appeal, respondent suggests that the psychological evaluation was untimely because it was not provided to the court until November 2021. However, the report was completed in April 2021, and the caseworker testified that she began accommodating respondent's disability after receiving the report. The fact that there was a delay in admitting the report into evidence is, therefore, not dispositive. Respondent also contends that there is no documentation to support that the caseworker was actually providing respondent with calendars and group chats. She did not present any evidence at the termination hearing, however, to refute the caseworkers' testimony. Respondent next complains that the caseworker would have respondent "repeat back" information whereas the psychological evaluation stated that respondent should be required to "teach back" the information. Yet, regardless of which phraseology is used, it is clear based on the caseworkers' testimony that she would provide the information to respondent and then would have her explain *her understanding* of it. Finally, respondent complains that it took almost one year for an adult

case services worker to be provided to respondent. The fact that services took time to set up, however, does not mean that DHHS neglected its duty to expend *reasonable* efforts to reunify a parent and child. Not every service will be immediately available to every parent.

In light of the foregoing, we conclude that the trial court did not clearly err by finding that the DHHS provided respondent with reasonable efforts aimed at reunifying her with her child and that it tailored those services to accommodate respondent's disability.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly